Jordan Susman, Esq. (SBN 246116)
jsusman@nolanheimann.com
Margo Arnold, Esq. (SBN 278288)
marnold@nolanheimann.com
NOLAN HEIMANN LLP
16133 Ventura Boulevard, Suite 820
Encino, California 91436
Telephone: (818) 574-5710
Facsimile: (818) 574-5689

Attorneys for Plaintiffs Clint Eastwood
and Garrapata, LLC

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINT EASTWOOD, an individual; GARRAPATA, LLC, a California limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>MEDIATONAS UAB, a Lithuanian private limited company DOES 2-30, inclusive,<br><br>Defendants. | Case No.: 2:20-cv-06503-RGK-JDE<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT**<br><br>Date: September 13, 2021<br>Time: 9:00 a.m.<br>Place: Roybal Federal Building<br>    and U.S. Courthouse<br>    255 East Temple Street<br>    Courtroom 850, 8th Floor<br>    Los Angeles, California 90012 |

-1-

MEMORANDUM OF POINTS AND AUTHORITIES ISO PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

# TABLE OF CONTENTS

I. INTRODUCTION……………………………………………………....1

II. PLAINTIFFS ARE ENTITLED TO MONETARY DAMAGES………….2

    A. Damages For The Use Of Mr. Eastwood's Name And Likeness Without Permission…………………………………………2

        1. The license fee for Mr. Eastwood's prior endorsement………4

        2. Garrapata's declaration of the minimum amount they would require for a license……………………………………...4

        3. License fees obtained by actors of similar statures…………...5

        4. License fee estimate by professor of marketing………………7

    B. Attorneys' Fees and Costs…………………………………………..9

        1. Mandatory Attorneys' Fees and Costs Under Civil Code Section 3344…………………………………………………...9

        2. Attorneys' Fees Under the Lanham Act……………………...10

    C. Damages for Defamation and False Light…………………………..12

IV. CONCLUSION…………………………………………………………14

# TABLE OF AUTHORITIES

**CASES:**

*Bernardi v. County of Monterey*,
  167 Cal. App. 4th 1379 (2008)……………………………………………………9

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984) …………………………………………………………….14

*Building a Better Redondo, Inc. v. City of Redondo Beach*,
  203 Cal. App. 4th 852 (2012) …………………………………………………...10

*CFTC v. Emerald Worldwide Holdings, Inc.*,
  2005 WL 1130588 (C.D. Cal. Apr. 19, 2005) ……………………………………2

*Cyma (U.S.A.) Ltd. v. Lumondi*, Inc.,
  2011 WL 1483394 (N.D. Cal. 2011) ……………………………………………..9

*De La Rosa v. City of San Jose*,
  2010 WL 1918658 (Cal. Ct. App. May 13, 2010) …………………………….....13

*Desmond v. News & Observer Publ'g Co.*,
  263 N.C. App. 26, 36, 823 S.E. 2d 412 (2018) ………………………………….12

*Discovery Communications, Inc. v. Animal Planet, Inc.*,
  172 F. Supp. 2d 1282 (C.D. Cal. 2001)… ……………………………………….11

*Ferriss v. All. Publ'g, Inc.*,
  2016 WL 7116110 (N.D. Cal. Dec. 6, 2016) …………………………………….3

*Garden City Boxing Club, Inc. v. Aranda*,
  384 F. App'x 688 (9th Cir. 2010) ………………………………………………..2

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ……………………………………………………………..12

*Hearts With Haiti, Inc. v. Kendrick*,
  141 F. Supp. 3d 99 (D. Me. 2015) ……………………………………………...12

*Hoffman v. Capital Cities/ABC, Inc.*,

33 F. Supp. 2d 867 (C.D. Cal. 1999) ……………………………………………..2

*Kirby v. Sega of Am., Inc.*,
    144 Cal. App. 4th 47 (2006) ……………………………………………………...9

*Love v. Associated Newspapers*, Ltd.,
    611 F.3d 601 (9th Cir. 2010) …………………………………………………10

*Lyons P'ship, L.P. v. D & L Amusement & Ent., Inc.*,
    702 F. Supp. 2d 104 (E.D.N.Y. 2010) …………………………………………..10

*Malletier v. Carducci Leather Fashions, Inc.*,
    648 F. Supp. 2d 501 (S.D.N.Y. 2009) …………………………………………..10

*Maughan v. Google Technology, Inc.*,
    143 Cal. App. 4th 1242 (2006) ………………………………………………….10

*PLCM Grp. v. Drexler*,
    22 Cal. 4th 1084 (2000) ………………………………………………………….9

*Raining Data Corp. v. Barrenechea*,
    175 Cal. App. 4th 1363 (2009) …………………………………………………...9

*Scranton Times L.P.*,
    634 Pa. 35, 129 A.3d 404 (PA. Sup. Ct. 2015) ………………………………….12

*Sweet People Apparel, Inc. v. Zipper Clothing*,
    2012 WL 1952842 (C.D. Cal. May 31, 2012) …………………………………..10

*Unsworth v. Musk*,
    2019 WL 8221086 (C.D. Cal. Nov. 27, 2019) ………………………………….12

*Waits v. Frito–Lay, Inc.*,
    978 F.2d 1093 (9th Cir. 1992) …………………………………………………….3

*White v. Samsung Elec.*,
    971 F.2d 1395 (9th Cir. 1992) …………………………………………………….3

*Wynn v. Francis*,
    2014 WL 2811692 (Cal. Ct. App. June 23, 2014) ……………………………...12

*Zynga Game Network Inc. v. Williams*,
  2011 WL 2560240 (N.D. Cal. June 28, 2011) ………………………………….11

**STATUTES:**

15 U.S.C. § 1117(a) ……………………………………………………………………10

Pursuant to Fed. R. Civ. P. 55(b), Plaintiffs Clint Eastwood and Garrapata, LLC (collectively, "Plaintiffs") respectfully request that the Court enter final judgment by default against Mediatonas UAB ("Mediatonas").

## I. INTRODUCTION

On June 23, 2021, this Court denied Plaintiffs' Motion for Default Judgment *without prejudice,* allowing Plaintiffs to refile the Motion with additional evidence concerning their damages. [Dkt. 75] (the "Order"). In its Order, the Court held:

- Deeming the facts in the Complaint true, the Court appears to have specific personal jurisdiction over Defendant. Order, p.3.
- On May 7, 2021, Defendant was properly serviced with notice of the Motion for Default Judgment. Order, p.3.
- Plaintiffs will be prejudiced if the Court does not grant default judgment. Order, p.3.
- Plaintiffs sufficiently stated a claim for the common law right of publicity. Order, p.4.
- Plaintiffs sufficiently stated a claim pursuant to California Civil Code § 3344. Order, p.4.
- Plaintiffs sufficiently stated claims for violation of the Lanham Act and common law trademark infringement. Order, p.5.
- Plaintiffs stated a prima facie case for defamation and false light. Order, p.5.
- Plaintiffs satisfied the requirements for a permanent injunction. Order, pp.6-7.

Accordingly, this Motion supplements Plaintiffs' previous Motion and exclusively concerns the remaining default judgment issue: Plaintiffs' monetary damages.

-1-

As the Court is aware, Mediatonas has refused to acknowledge this action and thereby denied Plaintiffs the opportunity to obtain discovery regarding Mediatonas' illegal scheme to use Mr. Eastwood's name and likeness without permission in false and defamatory advertisements, and the profits Mediatonas received from those false and defamatory ads.

Notwithstanding, Plaintiffs can prove monetary damages relating to Mediatonas' unlaw use of Mr. Eastwood's name and likeness and concomitant defamation of his character. In accordance with relevant law, and the evidence proffered herewith, Plaintiffs request the Court award the following relief: (i) the fair market value to license Mr. Eastwood's name and likeness, (ii) presumed defamation and false light damages, and (iii) attorneys' fees and costs.

## II.     PLAINTIFFS ARE ENTITLED TO MONETARY DAMAGES

Although the Court must make a determination regarding the damages requested in a motion for default judgment, the Court is "not required to conduct an evidentiary hearing to ascertain damages" where evidence of damages has been provided. *Garden City Boxing Club, Inc. v. Aranda*, 384 F. App'x 688, 689 (9th Cir. 2010). Under Local Rule 55-2, "if the amount claimed in a judgment by default is unliquidated, the applicant may submit evidence of the amount of damages by declarations." *See, e.g.*, *CFTC v. Emerald Worldwide Holdings, Inc*., No. CV03-8339AHM, 2005 WL 1130588, at *13 (C.D. Cal. Apr. 19, 2005) (finding "no reason to hold an evidentiary hearing on damages" because documentary evidence submitted by plaintiff was "sufficient" to enter default judgment).[1]

### A.     Damages For The Use Of Mr. Eastwood's Name And Likeness Without Permission

The standard for measuring damages in a right of publicity case is the fair

---

[1] Plaintiffs are more than willing to present additional evidence of their damages, including witness testimony, at a hearing, if the Court believes the evidence proffered herewith is lacking in any respect.

-2-

market value of the right to use plaintiff's name or likeness in the manner in which it was used by defendant. *See Hoffman v. Capital Cities/ABC, Inc.,* 33 F. Supp. 2d 867, 875 (C.D. Cal. 1999) (holding that actor Dustin Hoffman was entitled to compensatory damages in an amount representing the fair market value of the right to use his name and likeness in the manner in which it was used by defendant magazine); *see also Waits v. Frito–Lay, Inc.,* 978 F.2d 1093, 1111 (9th Cir. 1992) (singer-songwriter Tom Waits awarded the fair market value of his services on a voice misappropriation claim); *White v. Samsung Elec.,* 971 F.2d 1395, 1399 (9th Cir. 1992) ("the law protects the celebrity's sole right to exploit th[e] value" of their fame).

One way to calculate the fair market value of the right to use plaintiff's name or likeness is the willing licensor-willing licensee framework. *See Ferriss v. All. Publ'g, Inc.*, No. 15-CV-05675-EMC, 2016 WL 7116110, at *10 (N.D. Cal. Dec. 6, 2016). "This approach contemplates a hypothetical negotiation between [plaintiff] and [defendant] for the right to use [plaintiff's] name, likeness, and endorsement in connection with [defendant's products]. The harm to Plaintiffs, then, is the amount that [plaintiff] would have received from [defendant] for the endorsement if the two parties had come to an agreement." *Id*.

This calculation is difficult to do in this instance for two reasons: (i) Plaintiffs would never license Mr. Eastwood's name and likeness for little-known products that Mr. Eastwood does not use and that advertise through online "stories" and email spam (and that use false testimonials from other celebrities), and (ii) Garrapata has only licensed Mr. Eastwood's name and likeness once previously.

Notwithstanding the lack of historical data to calculate Mr. Eastwood's fair market license fee, there are four categories of information that can be used to calculate the fair market value of Mediatonas' illegal use of Mr. Eastwood's name and likeness: (i) the license fee of Mr. Eastwood's one prior endorsement, (ii)

-3-

MEMORANDUM OF POINTS AND AUTHORITIES ISO PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

Plaintiffs' declaration of the minimum amount they would consider for such a license, (iii) a comparison with the license fees obtained by actors of similar statures, including the amount awarded to Dustin Hoffman in his lawsuit, and (iv) the analysis and declaration of a professor of marketing at the University of Southern California Marshall School of Business.

### 1. The license fee for Mr. Eastwood's prior endorsement

The only time that Plaintiffs have licensed Mr. Eastwood's name and likeness was for a special Super Bowl television commercial in 2012 entitled *Halftime in America* ("*Halftime in America*") themed around America's resilience and recovery from the Great Recession. *Halftime in America* was shown once during the Super Bowl and then was not aired again. Because he felt strongly about the commercial, Mr. Eastwood accepted a fee well below his market value. Eastwood Decl. ¶ 5; Bernstein Decl. ¶¶ 5-7 (stating the amount of the fee and why it was below market value).

Comparatively, **Mediatonas used Mr. Eastwood's name and likeness for an ongoing online campaign that included unsolicited spam for an unknown product that Mr. Eastwood does not use and does not believe in**. Susman Decl. ¶¶ 2-5, Exhs. 1-11; Eastwood Decl. ¶ 3; Bernstein Decl. ¶¶ 5-7. Given these factors, Plaintiffs would not have licensed Mr. Eastwood's name and likeness for any less than his fee for Halftime in America. Bernstein Decl. ¶¶ 5-7.

Consequently, at a minimum, Plaintiffs are entitled to an award equal to the amount they received for Halftime in America.

### 2. Garrapata's declaration of the minimum amount they would require for a license

Howard Bernstein is the manager of Garrapata and has been since its formation in 2011. In addition, he has been a business advisor to Clint Eastwood for more than 50 years. As a general practice, Mr. Eastwood does not endorse products.

-4-

The only time an exception would be made is if the endorsement was for something Mr. Eastwood was deeply passionate about. Mr. Eastwood has not endorsed or lent his name or image to any third party products, other than the *Halftime in America* spot. And, to be clear, *Halftime in America* presented a unique opportunity to rally the country in the wake of the Great Recession. Bernstein Decl. ¶¶ 2-5.

As discussed above, Mediatonas' misuse of Mr. Eastwood's name and likeness was no *Halftime in America*. Therefore, according to Mr. Bernstein, the amount Plaintiffs would theoretically charge for Mr. Eastwood to endorse CBD products that Mr. Eastwood does not use or believe in and that are advertised online (with a simultaneous spam email campaign) for a 16-month period would be a **minimum** of $6 million. Mr. Bernstein **conservatively estimated** that a license fee for a 16-month online print campaign would start at $6 million for a reputable, high-profile product that one might associate with Mr. Eastwood (e.g., Chrysler). He then added a premium to this amount because the endorsement would be for unknown products that would rely more heavily on Mr. Eastwood's goodwill than an established brand, and such products would carry the risk of jeopardizing Mr. Eastwood's goodwill if the product was not received favorably by consumers. Bernstein Decl. ¶ 7.

### 3.   License fees obtained by actors of similar statures

A multi-million-dollar license fee for an endorsement campaign is not outrageous or unreasonable when the endorsing party is a celebrity of Mr. Eastwood's stature. While endorsement agreements—like other entertainment agreements—are usually kept confidential, Plaintiffs obtained information regarding numerous celebrity endorsement deals to show that Mr. Eastwood's request is reasonable when compared with other endorsement deals:

- In 2016, Selena Gomez signed a $10 million endorsement deal with Coach;
- In 2015, Jennifer Aniston received $5 million from Emirates Airline;

- In 2013 Brad Pitt received $3 million to appear in Cadillac commercials that only aired in China;
- In 2013, Robert Downey Jr. received $12 million to appear in commercials for two years for HTC, a Taiwanese smartphone manufacturer;
- In 2012, Brad Pitt received $7 million to endorse Chanel No. 5 fragrance;
- In 2011, Angelina Jolie endorsed Louis Vuitton for $10 Million;
- In 2006, Penelope Cruz received $2 million per year to endorse L'Oréal;
- In 2006, Angelina Jolie endorsed St. John for $12 million;
- In 2006, Gwyneth Paltrow received $3 million to endorse Estee Lauder perfume;
- In 2003, Justin Timberlake received $6 million to record McDonald's jingle entitled, "I'm Lovin' It";
- In 2003, Nicole Kidman received $12 million to endorse Chanel;
- In 2002, Catherine Zeta-Jones received $20 million to endorse T-Mobile.

Susman Decl. ¶¶ 6-9 Exhs. 12-15.

In addition, in 1989, Dustin Hoffman was awarded $1,500,000 in damages by the Central District of California for a magazine pictorial that misappropriated his name and likeness. *Hoffman*, 33 F. Supp. 2d at 871. The court considered five factors in determining the fair market value of *Los Angeles* magazine's misuse of Hoffman's name and likeness: 1. Hoffman's stature in the motion picture industry in the preceding 30 years; 2. The first-time use of Hoffman's name and likeness in a non-movie promotional context; 3. Self-perception by Hoffman of what impact the commercial use of Plaintiff's name and likeness would have on executives in the motion picture industry as being less of a box office draw; 4. Uniqueness of

-6-

opportunity in the role and character Hoffman had created in the motion picture Tootsie; and, 5. The fact that *Los Angeles* magazine was a regional periodical in the home town of the motion picture industry. *Id*. at 872.

Applying the foregoing factors to the instant case: 1. Mr. Eastwood's stature in the motion picture industry is unparalleled. As discussed in the operative complaint, Mr. Eastwood has been an icon for more than 50 years, and has won every possible award as an actor, producer, and director. 2. Other than *Halftime in America*, Mr. Eastwood's name and likeness have not be used in non-movie promotional context. 3. Because the fraudulent article alleges that motion picture studios are angry with Mr. Eastwood, Plaintiffs perceive that the fraudulent article had a negative impact on Mr. Eastwood's relationships in the motion picture industry. 4. This factor does not apply. 5. Unlike the Hoffman case, Mediatonas' use of Mr. Eastwood's name and likeness was not limited to Los Angeles and it was not limited to a single publication. The fraudulent article was published repeatedly online and was included in spam emails.

Based on the foregoing comparisons, Plaintiffs' request for an award of $6 million as the fair market value of Mediatonas' misuse of Mr. Eastwood's name and likeness in a series of online ads and spam email is reasonable and justified.

**4.      License fee estimate by professor of marketing**

Joseph C. Nunes holds the Joseph A. DeBell Endowed Professorship in Business Administration, and Professor of Marketing at USC's Marshall School of Business.  Mr. Nunes has published numerous papers in top marketing journals including the Journal of Marketing Research, the Journal of Consumer Research, Marketing Science, the Journal of Marketing, and Harvard Business Review. He serves on the editorial boards of the Journal of Marketing Research, the Journal of Consumer Research, the Journal of Consumer Psychology and Marketing Science. In 2006, he received Marshall's Dean's Award for Excellence in Research. Mr. Nunes has consulted for a variety of companies including Southwest Airlines,

Kampgrounds of America, Nestlè, and Abbott Laboratories. Through his work and experience, Mr. Nunes is familiar with the sums received by celebrities for numerous endorsement deals and the criteria that go into determining those fees. Mr. Nunes has reviewed the amounts reportedly received by the celebrities listed above, and believes those amounts to be accurate. In addition, Mr. Nunes is aware of the amount Mr. Eastwood received for *Halftime in America*, and believes that amount was substantially below Mr. Eastwood's fair market value.

Mr. Nunes has reviewed the fraudulent articles posted online by Mediatonas and the spam emails that are part of this Motion. Based upon his knowledge of the facts of this case, and his knowledge of other celebrity endorsement deals, Mr. Nunes has determined that the fair market value of Mediatonas' misuse of Mr. Eastwood's name and likeness easily exceeds $10 million.

Mr. Nunes arrived at this sum based upon several factors, including:

- Mr. Eastwood's stature in the motion picture industry is unparalleled;
- Mr. Eastwood has only done one non-movie promotion making any endorsement by him extremely rare and lucrative;
- Mediatonas used Mr. Eastwood's name and likeness in numerous online ads over the course of 16 months, including in spam emails;
- the CBD products advertised by Mediatonas are not well-known brands and therefore Mr. Eastwood would likely receive a premium for the use of his reputation and goodwill;
- the one ad that Mr. Eastwood lent his name and likeness to, Halftime in America, was not intended to sell cars but to inspire the nation;
- Halftime in America was consistent with Mr. Eastwood's reputation and brand for honesty, hard work, integrity, American resilience, and public service;
- Mediatonas' ads are inconsistent with Mr. Eastwood's reputation and

brand, because they promote unknown products and appear cheap, crass, low-end, and include a story that Mr. Eastwood is purportedly leaving the business that he loves to sell CBD products.

According to Mr. Nunes, Mediatonas' use of Mr. Eastwood's name and likeness on a fake news website with a spam email component, for products generally unknown to the public, for a period of time over 16 months, would justify a payment in excess of $10 million. Nunes Decl. ¶¶ 1-9.

### B. Attorneys' Fees and Costs

#### 1. Mandatory Attorneys' Fees and Costs Under Civil Code Section 3344

Civil Code Section 3344(a) and Section 3344.1(a)(1) provide in pertinent part: "The prevailing party in any action under this section **shall** also be entitled to attorney's fees and costs." (Emphasis added). "The mandatory fee provision of section 3344, subdivision (a) leaves no room for ambiguity. Whether the course is sound is not for us to say. This is the course the Legislature has chosen and, until that body changes course, we must enforce the rule." *Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 62 (2006).

"[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate." *PLCM Grp. v. Drexler*, 22 Cal. 4th 1084, 1095 (2000). "The reasonable hourly rate is that prevailing in the community for similar work." *Id*.

The services performed by Plaintiffs' counsel were reasonable and necessary. The Susman Declaration attached hereto in support of this Motion is *prima facie* evidence that those hours were necessary and are reasonable. *See Raining Data Corp. v. Barrenechea*, 175 Cal. App. 4th 1363, 1375 (2009); *Bernardi v. County of Monterey*, 167 Cal. App. 4th 1379, 1398 (2008); *Cyma (U.S.A.) Ltd. v. Lumondi*, Inc., 2011 WL 1483394, at *2-3 (N.D. Cal. 2011). Accordingly, the Court should

-9-

determine that Plaintiffs' counsel's hours were reasonable.

Plaintiffs' counsel's rate for the work performed is also reasonable. More than 10 years ago, courts recognized that $500 an hour and higher are reasonable hourly rates in the Los Angeles community. *See e.g., Maughan v. Google Technology, Inc.*, 143 Cal. App. 4th 1242, 1249(2006); *Building a Better Redondo, Inc. v. City of Redondo Beach*, 203 Cal. App. 4th 852, 871-73 (2012) (appellate court upheld a lodestar fee award with Los Angeles hourly rates of $500 to $550). Plaintiffs' request for fees between $490 and $590 per hour are imminently reasonable because they are less than the recognized reasonable hourly average in the area.

Plaintiffs have incurred attorneys' fees in the amount of $93,632. Susman Decl. ¶¶ 13-17 Ex. 16. Plaintiffs have incurred costs in the amount of $933.33. *Id.*

### 2. Attorneys' Fees Under the Lanham Act

Notwithstanding that Plaintiffs are already entitled to attorneys' fees under Cal. Civ. Code Section 3344, they are also entitled to such fees under Section 1117(a) of the Lanham Act, which provides, "The court in exceptional cases may award reasonable attorney fees to the prevailing party," 15 U.S.C. § 1117(a). The Ninth Circuit has interpreted the term "exceptional" to mean that "the defendant acted maliciously, fraudulently, deliberately, or willfully." *Love v. Associated Newspapers*, Ltd., 611 F.3d 601, 615 (9th Cir. 2010).

This action indisputably qualifies as an exceptional case.

First, when a defendant fails to respond to a complaint, it is construed as an admission that admitted that it acted "knowingly and intentionally or with a reckless disregard or willful blindness" to the plaintiff's trademark rights and the plaintiff, consequently, should be entitled to its reasonable attorneys' fees. *Malletier v. Carducci Leather Fashions, Inc.*, 648 F. Supp. 2d 501, 505 (S.D.N.Y. 2009); *Sweet People Apparel, Inc. v. Zipper Clothing*, No. CV 12-02759-ODW CWX, 2012 WL 1952842, at *4 (C.D. Cal. May 31, 2012); *Lyons P'ship, L.P. v. D & L Amusement*

-10-

*& Ent., Inc.*, 702 F. Supp. 2d 104, 119 (E.D.N.Y. 2010) ("When a defendant has defaulted, then by virtue of its default it is deemed to be a willful infringer.").

Second, the FAC states that Mediatonas' actions were "knowingly false, and are intentionally designed to capitalize on the goodwill, recognition, and fame associated with Mr. Eastwood" and Mediatonas "willfully, knowingly, and maliciously deceived and confused the relevant consuming public." FAC ¶¶ 5, 47, 57. Because the factual allegations of the FAC should be taken as true upon default, this case falls within the scope of "exceptional cases." *See Zynga Game Network Inc. v. Williams*, 2011 WL 2560240 (N.D. Cal. June 28, 2011) (holding that, upon entry of default, the plaintiffs' allegations in the pleading are sufficient to establish that this is an "exceptional" case for purposes of 15 U.S.C. § 1117(a)); *Discovery Communications, Inc. v. Animal Planet, Inc.*, 172 F. Supp. 2d 1282 (C.D. Cal. 2001) (holding that defendant's willful infringement and dilution of television programmer's "Animal Planet" mark, and failure to appear and file answer, resulting in default judgment, were exceptional circumstances entitling plaintiff to award of attorney fees and costs). This is indisputably an exceptional case under the Lanham Act, warranting an award of attorneys' fees.

Third, aside from the factual allegations within the FAC, Mediatonas' malice may be evidenced by the fact that it failed to contact either Mr. Eastwood or Garrapata to ask for permission to use Mr. Eastwood's name and likeness. Mediatonas' malice may be further may be evidenced by the fact that it stole each of the photos of Mr. Eastwood used in the fraudulent "article" from other websites. The first photo in the fraudulent "article" —Mr. Eastwood at the premiere of Jersey Boys—is owned by Reuters and was taken from a FoxNews.com article. Susman Decl. ¶ Ex. The second photo—Mr. Eastwood being honored at the 2015 CinemaCon—is owned by Getty Images and was taken from the HuffPost.com. Mediatonas' own conduct clearly establishes that it acted maliciously—thus making

-11-

this an "exceptional case" that warrants an award of attorneys' fees.

As discussed above, Plaintiffs' attorneys' fees total $93,632, and should be awarded to Plaintiffs under the Lanham Act. Susman Decl. ¶¶ 13-17 Exh. 16.

### C.  Damages for Defamation and False Light

"Defamation is an oddity of tort law," allowing juries to "award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974).  In a libel per se action, such as this, it is presumed that Plaintiff's reputation has been harmed and that he has suffered shame, mortification, or hurt feelings even if he has not proved any actual damages for harm to reputation or shame, mortification, or hurt feelings. *See Unsworth v. Musk*, No. 2:18-CV-08048-SVW-JC, 2019 WL 8221086, at *3 (C.D. Cal. Nov. 27, 2019). These damages are called "assumed" or "presumed" damages, and are often in the millions of dollars. *See e.g.*, *Wynn v. Francis*, No. B245401, 2014 WL 2811692, at *4 (Cal. Ct. App. June 23, 2014) (affirming jury award of $17 million in assumed defamation damages); *Hearts With Haiti, Inc. v. Kendrick*, 141 F. Supp. 3d 99, 125 (D. Me. 2015) (affirming jury award of $5 million in assumed defamation damages); *Joseph v. Scranton Times L.P.*, 634 Pa. 35, 78, 129 A.3d 404, 429 (PA. Sup. Ct. 2015) (affirming court award of $2 million for one plaintiff and $1.5 million for other plaintiff in presumed compensatory defamation damages); *Desmond v. News & Observer Publ'g Co.*, 263 N.C. App. 26, 36, 823 S.E. 2d 412, 421 (2018), *aff'd in part, rev'd in non-relevant part*, 375 N.C. 21, 846 S.E. 2d 647 (2020) (affirming jury award of $1.5 million in assumed defamation damages).

While Mr. Eastwood cannot quantify the actual damage to his reputation that was caused by defendant's defamation, he can provide evidence to aid the Court in determining the value of the presumed harm.

First, the fraudulent "article" was published online on numerous occasions for

more than 16 months. Plaintiffs documented it appearing on ten occasions, including a link to it sent via spam email (April 13, 2020; May 6, 2020; May 12, 2020; May 14, 2020; July 6, 2020; July 9, 2020; July 12, 2020; July 16, 2020; December 28, 2020; August 6, 2021). This means that the fraudulent "article" was not published once and then buried in the internet archives where it would not likely be seen again. Rather, it was repeatedly published so that it was seen repeatedly by new eyes. **In fact, the fraudulent "article" continues to be republished as recently as August 6, 2021**. Susman Decl. ¶ 5 Ex. 11.

Second, the fraudulent "article" did not just passively appear online. *See De La Rosa v. City of San Jose*, No. H033488, 2010 WL 1918658, at *14 (Cal. Ct. App. May 13, 2010) ("In evaluating presumed damages, the extent of the circulation of the defamation is admissible as evidence of the injury done to the person defamed.") Links to the fraudulent "article" were sent via at least two separate mailing lists – "Insider News Channel" and "Patriots Voter Poll." (July 7, 2020; July 12, 2020). Susman Decl. ¶ 3 Ex. 2. These emails respectively included hyperlinks teasing "Trending: Clint Eastwood Fires Back With Shocking Announcement" and "Breaking News: Clint Eastwood Exposes Shocking Secret Today" in order to entice readers to click on the link and view the fraudulent "article". *Id*.

Third, people observed the article and believed Mr. Eastwood was indeed affiliated with the product. Bernstein Decl. ¶ 8. Indeed, customer service at one of the CBD companies sued in this action received numerous calls from consumers, asking whether it was true that Mr. Eastwood was associated with their brand. Susman Decl. ¶ 18 Ex. 17.

Fourth, the fraudulent "article" caused Mr. Eastwood enough shame, mortification, and embarrassment to cause him to file this lawsuit, knowing that he would spend substantial sums on litigation that might never be recovered. Mr. Eastwood is known for his honesty, integrity, American grit and resilience, and hard

-13-

work. He has spent 60 years building his career in the motion picture industry. The fraudulent "article" trashed all of these things by falsely alleging that Mr. Eastwood was abandoning his motion picture career in order to shill CBD products to impressionable consumers. Any reasonable person would be mortified and embarrassed if they found out that they were the subject of the fraudulent "article". Bernstein ¶ 8; Eastwood Decl. ¶¶ 4-8.

Fifth, the fraudulent "article" caused Mr. Eastwood distress because he was concerned that his fans would see the fraudulent "article", assume he owned or was endorsing the CBD products, purchase the products because he was associated with them, and be harmed by the products or unsatisfied with the products. Eastwood Decl. ¶ 8.

Sixth, the fraudulent "article" was published with actual malice, as the defamatory statements therein were made with actual knowledge of their falsity. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 (1984). There is simply no basis for the false statements in the fraudulent "article," and they were wholly fabricated from whole cloth by Mediatonas. Eastwood Decl. ¶ 3.

Mr. Eastwood believes—based on the times the fraudulent "article" was published, the response of those who saw the fraudulent "article", the shame, mortification, and embarrassment the fraudulent "article" caused him, as well as the concern for his fans that a presumed damages award of $250,000 per publication ($2.5 million in total) would be appropriate. Eastwood Decl. ¶¶ 3-9.

### III. CONCLUSION

For the foregoing reasons, the Court should grant the Motion, enter final judgment by default against Mediatonas, and issue a final order in the form of the proposed Order submitted herewith. For the Court's convenience, a calculation of Plaintiffs' requested damages is attached to the Declaration of Joran Susman as Exhibit 18.

-14-

1 | Dated: August 11, 2021          NOLAN HEIMANN LLP

By: _____
Jordan Susman
Attorneys for Plaintiffs
Clint Eastwood
and Garrapata, LLC

-15-